**Robert B. NEWMAN, Plaintiff,**

v.

**Hon. George VOINOVICH, Defendant.**

No. C–2–92–248.

United States District Court, S.D. Ohio, E.D.

March 31, 1992.

Bruce I. Petrie, Graydon, Head & Ritchey, Cincinnati, Ohio, for plaintiff.

Kathleen McDonald O'Malley, Ohio Atty. Gen., Columbus, Ohio, for defendant.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

This case presents before the Court the question whether the failure to consider for appointment, or the denial of an appointment, to an individual by the governor of the state to sit as a state judge because of that individual's partisan political affiliation violates the individual's rights under the First and Fourteenth Amendments of the United States Constitution; Article I, § 11 of the Ohio Constitution; and, the Voting Rights Act, 42 U.S.C. § 1973 et seq.

Currently pending before the Court is a motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. Also before the Court is a motion by the defendant requesting the dismissal of the Complaint as it relates to the Voting Rights Act. A hearing was held before the Court on March 26, 1992, wherein the respective pending motions were argued.

It should be noted from the outset, that while this matter has all the makings of a politically based, Democrats v. Republicans, confrontation, in fact the issue before this Court is a constitutional issue and not a political issue, although in these times the differences are often blurred for political gain. The political affiliations of the governor, the proposed appointee, and the plaintiff are only relevant insofar as the governor of the state and the proposed

appointee are of the same party, to the exclusion of the individual desiring the appointment due to his or her antithetic political party affiliation.[1] If the act of placing considerable weight upon the candidate's political affiliation when appointing vacancies in the judiciary is deemed unconstitutional, then it will be unconstitutional for the current Republican governor just as will be unconstitutional for a subsequent Democratic governor.

## I.

The Plaintiff Robert B. Newman brought this suit against the Governor of the State of Ohio, Governor George Voinovich. Newman seeks to have this Court declare the judicial appointment practices of the governor violative of the United States Constitution[2], the Ohio Constitution and the Voting Rights Act. Newman further seeks to have this Court restrain the Governor, specifically, from appointing a successor to a seat in Hamilton County, Ohio, that the parties have stipulated will be opening on April 1, 1992, and generally, from appointing judges to any vacancies in the State of Ohio until a process is put in place that does not run afoul of the United States Constitution, the Ohio Constitution and the Voting Rights Act. Plaintiff Newman requests and proposes that a nonpartisan nominating committee be put in place in each county in Ohio for the purpose of considering all qualified and interested individuals for judicial appointment, without regard to the individual's political affiliation or race.

## II.

This case is a challenge to the appointment process provided for in the Ohio Constitution for the placement of judges due to vacancies at mid-term in the State of Ohio. Under Article IV, Section 13 of the Ohio Constitution, the Governor of the State of

Ohio has the power to appoint individuals to fill vacancies in judgeships in a court in the State of Ohio.

The Governor for the State of Ohio is Defendant George Voinovich. He is a registered Republican and was elected to his current position on the Republican party ticket. Pursuant to the Ohio Constitution, the responsibility of appointing individuals to vacant positions runs to the defendant. The plaintiff in this action, Robert Newman is a registered Democrat, and has run for election as such, however, he was not elected.

The specific position at issue in this case is the position of Hamilton County Common Pleas Judge. The current judge, the Honorable Norman Murdock, will resign from that seat effective April 1, 1992, and will be replaced by appointment of the Governor. It has been stipulated that the current Hamilton County Prosecuting Attorney Arthur Ney, a Republican, will receive the appointment.

In 1851 the framers of the Ohio Constitution extinguished a system of pure judicial appointment and opted for a system whereby the judges are elected and interim vacancies were filled by appointment of the governor. Ohio Const. art. IV, § 13. Ironically, this change was the result of a system wrought with chaos due to a massive turn over of judges each time a new political party controlled the legislature and because of the political patronage abuses that were becoming commonplace. Therefore, from 1851 to the present time, the appointment of judges has been limited to those occasions where a vacancy occurs midterm, then the appointee must run for election as the term ends if he or she wishes to retain the seat. These are precisely the vacancies for which we concern ourselves today. Under the current system there are no enunciated limitations in the Ohio Constitution to the governor's power of appointment.

---

1. To this end, the plaintiff at the hearing professed that he likewise found it inappropriate that the previous governor, a Democrat, appointed only Democrats to judicial vacancies.

2. "It is important to note that while it is the Fourteenth Amendment which bears directly

upon the State it is the more specific limiting principles of the First Amendment that finally govern this case." *Board of Education v. Barnette,* 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943).

This system of gubernatorial appointments and incumbent retention was challenged in 1938 and again in 1987. At those times there was an effort to amend the Ohio Constitution to alter the methods by which judges are both appointed and retained. These efforts were defeated and the methods of appointment and election remain unchanged.

At the hearing for the preliminary injunction, the Special Assistant to the Governor for Boards, Commissions and Judges, Andrew J. Futey, testified as to the procedures followed by the State when notified that a vacancy for a judgeship will occur. It was his testimony that upon learning of a vacancy he would contact the Republican Party Chairperson in the county where the vacancy has occurred to request recommendations. This was pursuant to the Judicial Procedures Manual, Step 2, as prepared by Mary Beth Marcholz, Assistant Deputy Legal Counsel ("Judicial Procedural Manual").[3]

The actual contact to the Republican Party County Chair person is made via letter sent under the signature of Governor Voinovich, wherein the governor states that he "want[s] to find the best and brightest, achieve demographic balance and select individuals who can be re-elected to the bench."[4] To that end the letter sets out the procedures to follow in nominating candidates for the governor's consideration. The letter asks that the county chairperson follow the current guidelines for the nomination of candidates for appointment as provided for by the local party rules, if any. The letter further provides that if there are no local party nominating guidelines they should "contact the chairman of the Ohio Republican party for advice and counsel." The county chairperson is called upon, "[o]n an informal basis ...", to "periodically submit to [the] local bar association the names of individuals being considered for appointment ... [and] ask the bar if the individual is qualified to fill the post they are being considered for." This is done on a confidential basis. The final request set forth by the Governor is that they submit to him "in writing the names of a minimum of two, preferably three candidates for each post, one of which must be a female or minority."[5] When submitting the names the county chairperson is asked to submit "extensive resumes and all other applicable documents regarding the appointment." It was the testimony of Futey that neither the Democratic Party Chairperson nor the Independent Party Chairperson[6] are contacted by the governor's office for nominations.

The Judicial Procedure Manual provides that "[w]hen deemed necessary, each candidate will be interviewed by the Director of Administration, Stratford Shields, and the Special Assistant to the Governor, Andy Futey." Judicial Procedures Manual at p. 2. Each of the recommended candidates are then called upon to complete a background information questionnaire which is utilized by the Department of Highway Safety so that a thorough background check can be completed. Once all of these steps are completed, Mr. Futey makes a final selection for recommendation to the Governor. The Governor, in turn, "reviews all of the submitted information for each candidate, including resume, interview, and background check and decides whether to approve or disapprove the recommended appointee." *Id.* At no time does the Governor suggest that party affiliation is not taken into consideration, nor could he based upon the facts in this case and the past history of every governor over the last century.[7] In fact, as noted by the plaintiff,

3. See Plaintiff's Exhibit P–16.

4. See Plaintiff's Exhibit P–15.

5. It was the testimony of Mr. Futey at his deposition that approximately twenty-five percent (25%) of the time only one name is advanced by the county chairperson, however, at the hearing he testified that seventy-five percent (75%) of the time only one name is advanced.

6. There was no testimony as to whether an Independent Party Chairperson even exists in Hamilton County.

7. The one apparent and notable exception is Governor John J. Gilligan.

there is considerable historical evidence that the governors of both parties have filled such vacancies on a partisan political basis. *See, e.g.,* Laurence Baum, *The Electoral Fates of Incumbent Judges in the Ohio Court of Common Pleas,* 66 Judicature 420, 430 (1983); Conference, *The Selection and Tenure of Judges in Ohio,* 8 U.Cin.L.Rev. 359, 414–15 (remarks of Judge Walter Shohl); 421 (remarks of Milton Schmidt); 437 (remarks of Joseph Graydon) (1934). As such, the appointment procedures followed by this gubernatorial administration and virtually every gubernatorial administration preceding it are in question; and the question is whether a governor may properly exclude an otherwise qualified candidate based soley upon that candidate's political affiliation.[8] The Court will now turn its attention to the standard to be applied to the instant matter.

## III.

In determining whether a preliminary injunction is appropriate the Court must consider and weigh four factors:

First, whether the movant has shown a "strong or substantial likelihood or probability of success on the merits";

Second, whether the issuance of an injunction will spare the movant from suffering "irreparable injury";

Third, "whether the issuance of a preliminary injunction would cause substantial harm to others"; and

Fourth, "whether the public interest would be served by issuing a preliminary injunction."

*Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). *See also, e.g., Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985); *In*

re *DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985); *Martin–Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 564–65 (6th Cir.1982); *USACO Coal Co. v. Carbomin Energy Inc.,* 689 F.2d 94, 98 (6th Cir.1982); and *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366, 368 (6th Cir.1981).

■ It has long been established that the four factors to be considered are not a "rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief." *Friendship Materials Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102 (6th Cir.1982). *See also Frisch's,* 759 F.2d at 1263; *Tate v. Frey,* 735 F.2d 986, 990 (6th Cir.1984); and *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537 (6th Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979). "[T]he four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.,* 755 F.2d at 1229. "That is, a strong showing of irreparable harm, decidedly outweighing harm to the defendant, may justify an injunction even where the movant cannot make a strong showing of likelihood of success on the merits...." *Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1427 (S.D.Ohio 1990) (Kinneary, J.) (citing *Frisch's,* 759 F.2d at 1263).[9] The Court will now turn its attention to the application of the four factors to the case *sub judice.* The first of the four factors is the "likelihood of success on the merits".

## A. LIKELIHOOD OF SUCCESS ON THE MERITS.

In order to address the issue of the movant's likelihood of success on the merits with regard to the underlying claims, the Court must first look to the Plaintiff's stat-

---

**8.** The Court views this as a constitutional question concerning the procedures utilized, and as such it is not necessary for the Court to reach the specific issue of whether the plaintiff himself is "qualified". For our purposes here we will assume that he is qualified.

**9.** This Court does not apply the "sufficiently serious question going to the merits" standard to the instant case, instead finding that such a standard is limited to Lanham Act cases such as

*Frisch's Restaurant, Inc. v. Shoney's Inc.,* and *Worthington Foods, Inc. See also Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.,* 670 F.2d 642 (6th Cir.) (Lanham Act case), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982); and *Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n,* 711 F.Supp. 1423 (S.D.Ohio 1989) (J. Graham) (Lanham Act case).

ed causes of action. It is based upon these claims that the Court must predict whether the movant's case is meritorious or frivolous, a possibility or impossibility; and in the end the Court must determine some probability, if any, of success on the merits. The two stated causes of action are a violation of the Voting Rights Act and a violation of the First and Fourteenth Amendments of the United States Constitution. Based upon the pending motion for dismissal concerning the Voting Rights Act claim, the Court will entertain that claim first.

1. *Voting Rights Act*, 42 U.S.C. § 1973 et seq.

The plaintiff alleges in his complaint that the "appointive actions of the Defendant violates the Voting Rights Act, 42 U.S.C. § 1973, by having a disproportionate impact upon black Americans in Ohio who are interested and qualified to be judicial appointees, and/or who wish to vote for black candidates in judicial elections." In response, the defendant asks that the Voting Rights Act claim be dismissed based upon a lack of standing.

A district court may not dismiss a claim under Rule 12(b)(6) for failure to state a claim unless it is apparent beyond a doubt to the court that the plaintiff can prove no set of facts to support a claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In determining whether the facts presented in a complaint support a claim upon which relief may be granted, the district court is to liberally construe the facts in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357, at 594 (1969). The essence of a court's inquiry is to determine whether the allegations contained in the complaint satisfy the mandate of the Federal Rules that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a).

At issue in the instant claim is whether standing exists to permit this plaintiff to carry his claim forward. It has long been held that standing "is perhaps the most important of the jurisdictional doctrines," thus placing federal courts under a special obligation to determine the threshhold issue of whether standing exists. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (citing *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). For the plaintiff to demonstrate standing under the Voting Rights Act he must demonstrate that (1) he has personally suffered or will suffer some distinct injury-in-fact as a result of defendant's putatively illegal conduct; (2) the injury can be traced with some degree of causal certainty to defendant's conduct; (3) the injury is likely to be redressed by the requested relief; (4) the plaintiff must assert his own legal rights and interests, not those of a third party; (5) the injury must consist of more than a generalized grievance that is shared by many; and (6) the plaintiff's complaint must fall within the zone of interests to be regulated or protected by the rule of law in question. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471–77, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982); *see also Allen v. Wright*, 468 U.S. 737, 751–52, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). Moreover, when, as in this case, the plaintiff is seeking injunctive relief he must establish that he personally faces a realistic, immediate, and non-speculative threat of being prospectively subjected to or harmed by the particular conduct at issue. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983).

The Court finds that the plaintiff has failed to make the required demonstrations. The plaintiff is attempting to shoehorn standing under the Voting Rights Act into the instant case by arguing that he is an "aggrieved person" as provided for under 42 U.S.C. § 1973a. He expounds upon this attempt to obtain standing by providing as follows:

[T]hat plaintiff has standing to raise the Voting Rights Act claims, in at least two respects. First, plaintiff has alleged that his right to vote for black judges has been impaired by the appointive scheme in question. Therefore, while plaintiff is not black, he is an "aggrieved person[ ]" entitled to bring suit under the Act. 42 U.S.C. § 1973a. According to the legislative history of this section (added by the Voting Rights Act of 1975), the provision was meant to codify the Court's decision in *Allen v. State Board of Elections*, 393 U.S. 544 [89 S.Ct. 817, 22 L.Ed.2d 1] (1969). That case makes numerous references to voters as plaintiffs without mentioning their race. Also, the legislative history states that an aggrieved person "may be an individual or an organization representing the interests of injured persons." S.Rep. No. 295, 94th Cong., 1st Sess. 1, 40 (1975), *reprinted in* 1975 U.S.Code Cong. & Admin.News 774, 806–07. Significantly, the Report cites *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205 [93 S.Ct. 364, 34 L.Ed.2d 415] (1972), a case which held that a white person had standing to raise claims of racial discrimination against nonwhites under the Fair Housing Act. The Fair Housing Act also permits aggrieved individuals "to bring suit." 42 U.S.C. § 3613(a)(1). Circumstances similar to *Trafficante* are present here.

Second and relatedly (sic), plaintiff's status as a class representative empowers him to raise the Voting Rights Act claims herein. The class he seeks to represent includes nonwhite voters and other nonwhite individuals.

■ In reviewing the pleadings and the responses set forth by the plaintiff at the hearing this Court disagrees with the plaintiff's argument of being an "aggrieved person" and finds no theory set forth by the plaintiff upon which this white male plaintiff may be permitted to advance the rights and interests of the minority population. *See Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979).

The extent of the plaintiff's testimony is that he has always been active and interested in seeing minorities elected or appointed to judicial positions. While this is a meritorious goal, this does not create standing. Furthermore, there has been no testimony that minorities have been excluded from the "processes leading to nomination or election in the state...." 42 U.S.C. § 1973(b). To the contrary, the expressed process of the current governor calls for the county chair to provide three names, one of which must be a minority or a female.

Furthermore, there has been nothing presented to this Court to suggest that minorities are prohibited from running for judicial positions at the time the appointed incumbent judge is running for election, thereby providing the plaintiff and voters an opportunity to vote for a minority candidate. The extent of the plaintiff's testimony as to "exclusion" is that minorities are "reluctant" to run for positions in Hamilton County due to the high rate of incumbency reelection. If in fact there is a high rate of incumbency reelection, that fact would impact minority and majority candidates alike and fails to show any personal suffering or disparate impact upon the plaintiff in particular, and minorities in general.

As such, the Defendant's motion to dismiss the claim under the Voting Rights Act is hereby GRANTED. Therefore, the Court turns its attention to the remaining claims to evaluate the plaintiff's likelihood of success on the merits.

2. *First and Fourteenth Amendment of the United States Constitution and the Ohio Constitution.*

■ The most difficult issue presented to this Court is the plaintiff's argument that the selection of judges based upon political affiliation, to the purposeful exclusion of those of any other political affiliation, constitutes a violation of the Ohio Constitution and the First and Fourteenth Amendments of the United States Constitution. The plaintiff acknowledges that this claim is based upon the holding in *Rutan v. Republican Party of Illinois*, 497 U.S. 62,

110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), and more specifically, upon the dissent filed by Justice Scalia. The Justice, writing his dissent in a 5–4 decision, on behalf of the minority, including Chief Justice Rehnquist, Justice Kennedy and Justice O'Connor provided as follows:

> Today the Court establishes the constitutional principle that party membership is not a permissible factor in the dispensation of government jobs, except those jobs for the performance of which party affiliation is an "appropriate requirement." *Ante*, at 2732. It is hard to say precisely (or even generally) what that exception means, but if there is any category of jobs for whose performance party affiliation is not an appropriate requirement, it is the job of being a judge, where partisanship is not only unneeded but positively undesirable. It is, however, rare that a federal administration of one party will appoint a judge from another party. And it has always been rare. *See Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803). Thus, the new principle that the Court today announces will be enforced by a corps of judges (the Members of this Court included) who overwhelmingly owe their office to its violation. *Something must be wrong here, and I suggest it is the Court.*

*Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 2746–47, 111 L.Ed.2d 52 (1990) (emphasis added). The import of *Rutan* to the instant case, and the plaintiff's case in particular, was suggested by Plaintiff's Counsel when he argued at the hearing, "[t]he event of enormous importance that has occurred here which makes a change essential is *Rutan*. Without *Rutan* and without Justice Sca-

lia's comment about the judicial branch, we wouldn't be here." Transcript at 3.

The plaintiff asks this Court to interpret the language of this dissent as "recognizing instantly if there ever was a position in government where political affiliation is not essential, it is judgeships." Transcript at 4. And further, as paraphrased by plaintiff's counsel, that Scalia was saying "I don't like this rule; but if that is the rule, then it's going to apply to judges." Transcript at 6.

This Court does not share in the plaintiff's interpretation. It seems apparent to this Court that the language selected by Scalia was carefully chosen to show not only the irony of the majority's decision, but in fact how ridiculous he believed the Court's conclusion was.[10] Only this interpretation explains the closing comment that "[s]omething must be wrong here, and I suggest it is the Court." Furthermore, the comment of Scalia is not the holding of the case, rather it is dicta contained in the dissent. It demonstrates the fervor of his disagreement rather than any extension of the decision to judicial appointments. Therefore, an constitutional violation will have to come from an expanded interpretation of *Rutan* and other such cases.

As such, the plaintiff is calling upon this Court to broaden the holdings of *Rutan*, *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980)[11]; and *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), to include the appointment of judges. In order to do so, the Court must first look at the facts and the holdings in these respective cases.

The product of *Elrod* and *Branti* was a holding that patronage dismissals of certain public employees violate the rights to freedom of political belief and association

---

**10.** In *Payne v. Tennessee*, —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), Former Justice Thurgood Marshall, in one of his final decisions wrote, "[b]ased on the majority's new criteria for overruling, these decisions ... must be included on the 'endangered precedents' list: *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (First Amendment right not to be denied public employment on the basis of party affiliation)...."

**11.** Ironically, the facts surrounding *Branti* concerned a Democrat who had recently been *appointed* as Public Defender by the county legislature. Since there was no challenge to the appointment, it is not clear whether it was a political patronage appointment, however, the Court held that the appointed official could not discharge assistant public defenders due to their Republican political affiliation.

protected by the First Amendment. In *Elrod* the newly elected Democratic Sheriff either discharged or threatened to discharge employees if they were not affiliated with or sponsored by the Democratic Party. The Supreme Court, in a 5–4 decision, written by Justice Brennan, with a concurring opinion by Justices Stewart and Blackmun, found that these patronage dismissals severely restrict political belief and association, which constitutes the core of those activities protected by the First Amendment, and government may not, without seriously inhibiting First Amendment rights, force a public employee to relinquish his right to political association as the price of holding a public job. *Elrod,* 427 U.S. at 355–60, 96 S.Ct. at 2681 (citing *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), and *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)).

The Court, however, further concluded that patronage dismissals of governmental officials holding policymaking positions were justified "to ensure that policies which the electorate has sanctioned are effectively upheld." *Elrod* 427 U.S. at 372, 96 S.Ct. at 2689. This gave birth to the "policymaking" distinction the courts have since been forced to struggle with. As a result of *Elrod* the courts have been called upon to determine the extent of the employee's responsibilities, whether the responsibilities are narrowly or broadly defined, and whether the employee "acts as an adviser or formulates plans for the implementation of broad goals." *Id.* at 368, 96 S.Ct. at 2687. This has proved to be a difficult task.

In *Branti,* the Court reformulated the "policymaking" equation of *Elrod* to instead provide that the patronage activity was permissible if the "hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295. This approach has since been recognized and utilized in the Sixth Circuit and other circuits. *Faughender v. City of North Olmstead, Ohio,* 927 F.2d 909 (6th Cir. 1991); *see also Stott v. Haworth,* 916 F.2d 134 (4th Cir.1990) and *Jones v. Dodson,* 727 F.2d 1329 (4th Cir.1984).

In the final case of the trilogy, *Rutan,* the Court upheld the rationale of *Elrod* and *Branti,* and broadened the mandates to include hiring, firing, transfers, promotions, and recalls from layoffs. The question before this Court is whether *Elrod* and its progeny may be expanded to include gubernatorial appointments. To that question this Court answers in the negative.

Numerous cases have been brought to the attention of this Court, yet not one of the cases reflects a challenge to the appointment of judges. Instead, these cases address executive branch hiring and firings of executive branch employees. *See, e.g., Williams v. City of River Rouge,* 909 F.2d 151 (6th Cir.1990) (city attorney did not enjoy First Amendment protection against politically motivated dismissal as it was a position for which political affiliation was appropriate requirement for effective performance); *Livas v. Petka,* 711 F.2d 798 (7th Cir.1983) (assistant state prosecutor termination upheld); *Newcomb v. Brennan,* 558 F.2d 825 (7th Cir.) (deputy city attorney termination upheld), *cert. denied,* 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977); *O'Connell v. Gorski,* 715 F.Supp. 1201 (W.D.N.Y.1989) (rational connection existed between shared ideology and job performance of assistant county attorney); *Finkelstein v. Barthelemy,* 678 F.Supp. 1255 (E.D.La 1988) (city attorney could be fired for not supporting mayor's unsuccessful property bill); *Mummau v. Ranck,* 531 F.Supp. 402 (E.D.Pa) (assistant attorney who only prosecuted juvenile cases termination upheld), *aff'd per curiam,* 687 F.2d 9 (3rd Cir.1982); *Bavoso v. Harding,* 507 F.Supp. 313 (S.D.N.Y.1980) (city corporate counsel termination upheld); *Montaquila v. St. Cyr,* 433 A.2d 206 (R.I.1981) (town solicitor and county solicitor termination upheld).

To the contrary, the situation before this Court involves the gubernatorial appointment of an interim judge to vacancies created mid-term. The position the judge occupies is not one in the executive branch of

the government, rather it is in the judicial branch. Unlike a "policymaking" employee, or an employee where political affiliation is "an appropriate requirement for the effective performance of the public office involved", the judge, once appointed, no longer serves at the pleasure of the governor and no longer can be looked upon to further the policies of the administration. This, however, does not mean that the candidate cannot be tapped to be an appointee for his or her views and beliefs. The plaintiffs argue that "it cannot follow that the Governor may properly appoint judges with the *purpose* and *expectation* that the judge will decide a case in a manner consonant with the Governor's political views." Memorandum With Respect to Certain Matters Raised by the Court During the Hearing at 2 (emphasis added). This Court disagrees.

Specifically, the Court notes the Seventh Circuit decision of *Kurowski v. Krajewski*, 848 F.2d 767 (1988), wherein the Court provided in dicta as follows:

> A judge both makes and implements governmental policy. A judge may be suspicious of the police or sympathetic to them, stern or lenient in sentencing, and political debates rage about such questions. In most states judges are elected, implying that the office has a political component. Holders of the appointing authority may seek to ensure that judges agree with them on important jurisprudential questions. The Governor of Indiana was entitled to consider Krajewski's views about the role of judges—*or even simply Krajewski's political affiliation*—when making the appointment [to the Supreme Court for the State of Indiana], just as the voters may consider these factors without violating the [F]irst [A]mendment when deciding whether to retain Judge Krajewski in office. (We put aside all debate about whether recourse to politics in selection judges is

good or bad; we are concerned only with the constraints the [F]irst [A]mendment imposes on the way the State of Indiana prefers to organize its government.)

*Id.* at 770 (emphasis added).[12] The Court was clearly of the that political affiliation was an appropriate basis upon which a judge may be appointed.

Certainly the people of the State of Ohio that elected Governor Voinovich did so under the belief that he will make appointments in his ideological likeness. While it is true that the Governor should not "expect" an appointed judge to rule a certain way on any specific case, he may "hope" that a judge will making rulings consistent with a general ideology. To this end, a governor, for example, that has run a successful campaign on a "tough on crime" platform would be expected to select judges that harbor a similar general doctrine and would carry forth those beliefs in his or her imposition of the laws of the state. Furthermore, it is irrefutable that the difference between political parties are their views on a large variety of issues important to their respective parties. While some individuals in each party may share similar views on a few, or even several areas, the consistent trend is that the members of one party or another have joined their respective party due to their common interests, goals and views. So it is not unusual, and certainly not unconstitutional, for the governor, regardless of the governor's political party affiliation to look to his or her party for individuals with similar beliefs.

This is not to suggest, however, that there is not an element of political patronage to the selection of judges, both at the state and federal level. This certainly was recognized by Justice Scalia. However, to suggest that among the ranks of state and federal judges there is a corps of incompetence due to this political patronage factor, grossly overstates the minimalistic

---

**12.** The Court ultimately upheld a Magistrate Judge's determination that the termination of public defenders for their political affiliation was a violation of their First Amendment rights because, although an individual in the public defender position may have the potential of being named as a judge *pro tempore,* the public defender duties do not include judicial service. Any lawyer could be named as a judge *pro tempore.* Therefore, the position of public defender was not one which be filled based upon political affiliation.

effect of granting some consideration to an individual's political affiliation prior to appointment. To the contrary, I would suggest that there is no shortage of lawyers[13], nor lawyers qualified to be judges, nor qualified lawyers of a variety of political affiliations; Republicans, Democrats, and Independents alike.

The other matter which distinguishes this case and the appointment process from *Elrod* and its progeny is the fact that within a matter of months the appointee is called upon to face the electorate to determine whether he or she is suitable to retain the position to which he or she has been appointed. The specific employment decisions in *Elrod*, *Branti* and *Rutan* are never subject to approval by the people of the state. While I am certain the title of incumbent is a benefit, it should be noted that the incumbent is not identified on the ballot, and the title of incumbent is no guarantee of success at the ballot box. Therefore, if the Governor has not selected an appointee wisely, that fateful decision is subject to rejection by the people of the county. At that time, the individual thwarted by the appointment process may wage a campaign against the appointed judge.

As for the process itself, it is set forth in the Ohio Constitution. However, the process was not always as it is today. As previously discussed, a major change was effectuated in 1851. At that time the power of appointment was taken from the legislature and given to the people. The only vestige of the appointment process is the governor's appointments to vacancies. This process has served the State of Ohio well and has survived two challenges; the latest of which was as recent as 1987. Clearly change can come about as it did in 1851 through amending the Ohio Constitution, however, this has not been done. Instead, the plaintiff has asked this Court to accomplish with its powers and a broadening of some case law, that which could not be accomplished through the legislative process, and that is to amend the Ohio Constitution to revoke the Governor's power of appointment to vacant judicial seats. This Court declines the use of that power. The people of the State have effectively provided their elected Governor with their proxy vote for the selection of interim vacancy judgeships. Should the governor abuse the power, legislative recourse is available.

Notwithstanding, if the Court were to view this case through the prism cast by *Elrod*, *Branti* and *Rutan* the position of Common Pleas Judge can be considered one where political affiliation is an appropriate requirement for the effective performance of the public office. This is true especially in light of the fact that the people who elect the governor of a state should reasonably expect, and should be permitted to reasonably expect, that the governor will implement his or her views and political platform through various means and methods including the selection of judges, if provided for by that state's constitution.

Therefore, the Court finds that the plaintiff does not have a substantial likelihood of succeeding on the merits of this case. The Court now turns its attention to the second and third factors to be weighed in considering the motion for a preliminary injunction; that being whether the issuance of an injunction will spare the movant from suffering "irreparable harm", and whether the issuance of a preliminary injunction would cause substantial harm to others.

## B. IRREPARABLE HARM TO PLAINTIFF AND SUBSTANTIAL HARM TO OTHERS.

■ The Court does not view the plaintiff's alleged harm as irreparable given that the greatest "harm" he may experience is that he will not receive appointment to the bench being vacated by Judge Murdock. Other appointments are sure to come. As provided by the defendant, in little more than a year that the Governor

---

**13.** Dan Quayle, Agenda for Civil Justice Reform in America, Address before the American Bar Association (August 13, 1991). In the report the Vice President notes that the United States is home to 70% of the world's lawyers.

has been in office he has made eight judicial appointments in Hamilton County alone.

In turn, the effect upon the defendant of issuing a preliminary injunction preventing the appointment of the candidate is to leave the candidate in an unknown position for an unknown period of time. The stipulated appointee is the current Hamilton County Prosecuting Attorney. He must, at some point, declare his intentions concerning re-election to his current position if he does not receive the appointment he seeks. With the State laws regarding filing deadlines, coupled with the need for those individuals who may wish to run for election to the Hamilton County Prosecuting Attorney position, and all of the decisions that hinge upon the contingencies inherent in declaring candidacy, a preliminary injunction would leave several individuals, Republicans and Democrats alike, in the very difficult position of unknown future employment as well as unknown elective opportunities. As such, the Court does not find that the plaintiff is faced with irreparable harm. Further, the Court is of the opinion that a preliminary injunction at this time would cause substantial harm to a wide variety of candidates and potential candidates for a variety of Hamilton County elected positions. The Court will next review the question of whether the public interest would be served by issuing a preliminary injunction.

C. PUBLIC INTEREST.

Certainly the public interest will be best served by the resolution of the instant matter so as to permit the efficient and effective administration of our chosen governmental processes. However, the test facing this Court is whether the public would be served by a preliminary injunction. Based upon the representations of counsel, the answer to this question apparently depends on whether "the public" is a Republican or a Democrat. Either way, in considering all four factors this Court finds that the plaintiff has failed to bear the necessary burden and thus a preliminary injunction should not be granted. As such, the motion for a temporary restraining order and a preliminary injunction is hereby DENIED.

Further, the Court *sua sponte* finds that the Plaintiff has failed to state a claim upon which relief can be granted under the remaining claims and therefore under Rule 12(b)(6) of the Federal Rules of Civil Procedure the remaining claims are hereby DISMISSED. This is a final appealable order.

IT IS SO ORDERED.