**CONWAY SCHOOL DISTRICT, Plaintiff,**

v.

**Gene WILHOIT, Director, Arkansas Department of Education, Defendant.**

**No. LR–C–93–637.**

United States District Court,
E.D. Arkansas,
Little Rock Division.

June 13, 1994.

---

William Clay Brazil and Michael Murphy, Brazil, Clawson, Adlong, Murphy & Osment, Conway, AR, for plaintiff.

Elizabeth Boyter, Arkansas Dept. of Educ., Little Rock, AR, for defendant.

### MEMORANDUM OPINION AND ORDER

WILSON, District Judge.

Plaintiff has filed a complaint requesting the Court to enter an Order that the Conway School District is in compliance with the Voting Rights Act of 1965 and therefore does not have to elect by single-member zones as required by Act 1169 of 1993, A.C.A. 6–13–631. The Arkansas statute in question states that beginning with the 1994 annual school election, the electors of a school district having a 10 percent or greater minority popula-

tion shall elect the members of the board of directors "as authorized in this section, utilizing selection procedures in compliance with the federal Voting Rights Act of 1965, as amended." A.C.A. 6–13–631(a). At least 90 days before the annual school election, the act requires that "the local board of directors shall:

(A) By resolution choose to elect board members from five (5) or seven (7) single-member zones or from five (5) single-member zones and two (2) at large; and

(B) With approval of the controlling county board of education, shall divide each school district having a ten percent (10%) or greater minority population into five (5) or seven (7) single-member zones in accordance with the federal Voting Rights Act of 1965, as amended."

2) Zones shall have substantially equal population, with boundaries based on the most recent available federal decennial census information.

The 1990 federal census information indicated that 11.8 percent of Conway School District's total population is black or "other," and 10.9 percent of the district's voting age population is black or "other." The act contains several provisions exempting districts from its provisions in districts that are currently operating under federal court orders enforcing school desegregation or the Voting Rights Act, a district that is operating under a preconsolidation agreement, a district that has a zoned board meeting the Voting Rights Act's requirements, or a district that a federal court has ruled is not in violation of the Voting Rights Act, so long as the court order is in effect. A.C.A. 6–13–631(g)(4). The Arkansas Department of Education shall withhold 20 percent of the annual state funds to a district that is not in compliance with the act. Plaintiff prays for an Order that it is in compliance with the federal Voting Rights Act and therefore does not have to elect by zone, and further that the defendant be enjoined from withholding any funds to the plaintiff based on the authority granted by A.C.A. 6–13–631. Plaintiff has also presented arguments based upon the Supreme Court's recent decision in *Shaw v. Reno,* —— U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511

(1993), and has contended that the preclearance requirement of the Voting Rights Act is applicable to this case.

Defendant, Gene Wilhoit, Director of the Arkansas Department of Education, has filed a motion to dismiss because plaintiff lacks standing under the Voting Rights Act of 1965, 42 U.S.C.1973, the Declaratory Judgment Act, 28 U.S.C. 2201, or 28 U.S.C. 1331, the federal question statute. Defendant is correct and defendant's motion to dismiss will be granted, for the reasons discussed below.

## STANDING

■ Article III of the United States Constitution confines the federal courts to adjudicating actual "cases and controversies." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The Supreme Court has stressed that the several doctrines—standing, ripeness and others—that have elaborated the "case or controversy" requirement "state fundamental limits on federal judicial power in our system of government." *Id.* Standing is a threshold issue in every case before a federal court, determining the power of the court to entertain the suit. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). A federal court's jurisdiction can be invoked only when the plaintiff has suffered "some threatened or actual injury resulting from the putatively illegal action." *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). The Supreme Court defined the constitutional requirements of standing in *Allen v. Wright,* supra, at 751, 104 S.Ct. at 3324: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."

■ In addition to the constitutional requirements, there are also prudential rules of standing that have served to limit the role of the courts in resolving public disputes. *Warth,* at 500, 95 S.Ct. at 2206. These "judicially self-imposed limits on the exercise of federal jurisdiction" include such prudential rules as the "prohibition on a litigant's raising another person's legal rights, the rule

barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright,* at 751, 104 S.Ct. at 3324. Regarding these prudential rules, the Supreme Court held that a federal court must ask whether "the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position .a right to judicial relief." *Warth,* at 500, 95 S.Ct. at 2206. Plaintiff is asking for a declaratory judgment that it is in compliance with the Voting Rights Act. The Voting Rights Act originally conferred standing in express terms only upon the U.S. Attorney General. However, Chief Justice Warren's opinion for the Supreme Court in *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) held that private litigants attempting to protect their voting rights were also proper parties to bring about the goals of the Act, and thus granted standing to aggrieved voters "seeking judicial enforcement of the prohibition" against infringements upon the right to vote based on race. *Id.* at 557, 89 S.Ct. at 827. Congress responded to the Supreme Court's holding in *Allen v. State Board of Elections* by amending the Voting Rights Act to expressly confer standing upon "aggrieved persons" to enforce their voting rights. 42 U.S.C. 1973a.[1] The Eighth Circuit has held that "standing to sue under [the Voting Rights Act] is limited to the [U.S.] Attorney General and to 'aggrieved persons,' a category that we hold to be limited to persons whose voting rights have been denied or impaired." *Roberts v. Wamser,* 883 F.2d 617, 624 (1989).

■ The Court finds that plaintiff fails both the general tests for standing as stated in *Warth v. Seldin* and *Allen v. Wright,* as well as the specific tests for standing under the Voting Rights Act. Plaintiff is obviously not an agent of the U.S. Attorney General, and it is not suing as an "aggrieved voter";

thus it clearly fails the standing tests under the Voting Rights Act. *Allen v. State Board of Elections,* supra; *Roberts,* supra. As the Eighth Circuit emphasized in *Roberts,* "The purpose of the Voting Rights Act is to protect minority voters." *Id.* at 621. In *Roberts,* the plaintiff was an unsuccessful candidate for office who sought to bring a challenge to a punch-card voting system under the Voting Rights Act. The Court observed that "Roberts is not an aggrieved voter suing to protect his right to vote. Nowhere in his complaint (or anywhere else) does Roberts claim that his right to vote has been infringed because of his race." *Id.* Similarly, in the case at bar Conway School District does not make any allegation that it is suing to protect the rights of aggrieved voters. There is no allegation that minority voters would have their voting rights impaired by the change from at-large electoral districts to single-member districts.

The facts in *Roberts* were obviously not similar to those in the case at bar. A federal case applying the same legal principles in a factual context that was closer to *Conway School District v. Wilhoit* was *Illinois Legislative Redistricting Commission v. LaPaille,* 782 F.Supp. 1267 (N.D.Ill., 1991). In *LaPaille,* the original plaintiffs—the majority members of the Illinois Legislative Redistricting Commission, a state governmental body—sought a declaratory judgment action that a proposed redistricting plan for the Illinois General Assembly that the Commission had approved was in compliance with the Voting Rights Act and also certain provisions of state constitutional law in Illinois. *Id.* at 1269. The District Court ruled that "The Redistricting Commission and its Republican majority are not suing as voters and therefore lack standing under the Voting Rights Act." *Id.* at 1270. Furthermore, the Court observed that "There is a more general problem with these present and prospective plaintiffs; the complaint does not identify any potential injuries to federal rights of any sort which they might suffer and no such

---

1. Section 3. Proceeding to enforce right to vote. "(a) Whenever *the Attorney General or an aggrieved person* institutes a proceeding under any statute to enforce the voting guarantees of the Fourteenth or Fifteenth Amendments in any State or political subdivision the Court shall authorize the appointment of federal examiners ... to enforce the guarantees of the Fifteenth Amendment ..." 42 U.S.C. 1973a. (emphasis added).

injuries are apparent." Plaintiffs had failed to cite any injury that would have befallen them if the redistricting plan had not been declared valid under the Voting Rights Act. *Id.* The Court held that "the litigation could not proceed if the only plaintiffs were" the Redistricting Commission and two other parties that were not suing as aggrieved voters. However, the *LaPaille* Court went on to hold that an amended complaint in that case "would add Reed, a voter and American citizen of African heritage, as a plaintiff. That complaint alleges that Reed ... as well as other voters similarly situated will suffer a host of injuries to their voting rights." *Id.* at 1271. The Court found standing in the amended complaint because Reed was representing minority voters whose voting rights would allegedly have been harmed.

*LaPaille* began in a manner similar to the instant case. Plaintiff here suffers the same problems as the original plaintiffs in *LaPaille,* where the Illinois District Court found not only the lack of standing under the Voting Rights Act pursuant to *Roberts,* but "a more general problem" that the complaint did not identify any potential injuries to federal rights. *Allen v. Wright* requires allegations of "injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Wright,* supra, at 751, 104 S.Ct. at 3324. The only allegation of a potential injury by plaintiff is a 20% reduction of state funding to the Conway School District if it fails to comply with the new state statute's requirements for single-member zones in school board elections. This alleged injury has nothing to do with denial or impairment of voting rights, the only injury intended for remedy under the Voting Rights Act. Plaintiff also fails the requirement of injury "fairly traceable to the defendant's allegedly unlawful conduct." There is no allegation that the defendant has committed any unlawful conduct. Defendant has not argued that plaintiff is not in compliance with either the Voting Rights Act or the state statute, and has not threatened to exact any loss of funding. The Conway School District has made no argument that it would have any difficulty complying with both state and federal law requirements. Even assuming *arguendo* that the alleged injury of a funding loss were relevant for this type of case, if such a loss occurred it would not be caused by any conduct by defendant, but by the plaintiff's future failure to comply with the state law. Plaintiff could easily eliminate the hypothetical threat of such an injury by following the law.

■ Plaintiff amended its complaint to add 28 U.S.C. 1331, the federal question statute, as a basis for jurisdiction, and to argue that it qualified for an exemption under Section (g)(1), which exempts districts currently operating under a federal court order enforcing school desegregation. Plaintiff stated that it was currently operating under *Raney v. Board of Education of Gould School District,* 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968) and other federal court orders enforcing school desegregation in Arkansas. Unlike *LaPaille,* the amended complaint fails to resolve the standing problem. The amended complaint asked for a determination that the plaintiff is in compliance with the previous desegregation orders of the federal courts. The addition of the federal question statute as an alleged basis for jurisdiction is unavailing to plaintiff, for merely alleging that a complaint involves an interpretation of a federal issue does not create a right to gain an advisory opinion in the absence of a case or controversy. The requirement of standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *United States v. Richardson,* 418 U.S. 166, 174, 94 S.Ct. 2940, 2945, 41 L.Ed.2d 678 (1974).

Plaintiff objects that it was asking for a broad interpretation of (g)(1), for "absent such a broad interpretation, i.e., that a school district has not been sued in federal court and has historically adhered generally to the directives of the U.S. Supreme Court and lower federal courts with respect to desegregation directives, the statute in question might foreclose an exemption to the very districts which have historically taken a progressive posture on desegregation issues." Plaintiff's argument in the amended complaint regarding (g)(1) is without merit. The Supreme Court in *Raney* declared unconstitutional any "freedom of choice" plan that

was a subterfuge for evading *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *Raney* was handed down 26 years ago and the Court's decision applied not only to all Arkansas school districts but any district anywhere that tried to use a "freedom of choice" plan. Conway School District is obviously in compliance with *Raney* since it is not today attempting to operate a freedom of choice plan. In 1994, all districts in Arkansas are in compliance with *Raney,* and thus on plaintiff's logic all would qualify for the exemption under (g)(1) and the Arkansas statute A.C.A. 6–13–631 would be rendered a nullity. Such a result would be absurd, and *Raney* obviously cannot be considered a "currently operating" court order for the purpose of the statute. Section (g)(1) would apply to a federal court order currently in force enforcing desegregation in a specific district. Plaintiff acknowledges that there is no such federal court order specifically addressed to the Conway School District and currently in effect. Hence, the exemption in (g)(1) does not apply to Conway. Plaintiff seems to believe that the exemptions were to be handed out as rewards to districts that have been "progressive" in desegregation in the sense that they have not been sued in federal court, but there is nothing in the statute to support that interpretation. Obviously, many districts have never been sued in federal court and have "attempted to be in compliance with general orders of Arkansas Federal Courts and the United States Supreme Court" regarding desegregation. The exemption in (g)(1) could logically be interpreted as attempting to avoid any conflicts or complications between the state statute and specific, ongoing federal court orders. As discussed above, the express terms of (g)(1) clearly do not provide an exemption for Conway.

■ The third and final statute plaintiff cites in its effort to find jurisdiction is 28 U.S.C. 2201, the declaratory judgment statute. This argument is also without merit. The statute requires that the case be one of "actual controversy," with an emphasis on the immediacy of the threatened injury. *Harris Trust and Savings Bank v. E–II Holdings, Inc.,* 926 F.2d 636 (7th Cir.1991). The Supreme Court has held that "the ques-

tion in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). The Declaratory Judgment Act does not create an exception to the prohibition against advisory opinions—as the Supreme Court once warned, courts do not sit "to give advisory opinions about issues as to which there are not adverse parties before it." *Princeton University v. Schmid,* 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982). The Eighth Circuit held that the declaratory judgment statute "does not expand the District Courts' jurisdiction, but merely authorizes them to declare the legal rights of parties in cases over which they would otherwise have jurisdiction." *Pulido v. Bennett,* 848 F.2d 880, 887 (8th Cir.1988). Plaintiff lacks standing under the Voting Rights Act, and the declaratory judgment statute act cannot confer that right in the absence of any other basis for jurisdiction.

What plaintiff is seeking is precisely what the Supreme Court prohibited in *Princeton University* and other cases: an advisory opinion about an issue—whether Conway School District is in compliance with the Voting Rights Act—to which there are no adverse parties. Not only does defendant not attack plaintiff for any violation of the Act, it states its hope "that Plaintiff *is* currently in compliance with federal voting rights requirements;" obviously there is an absence of adverse parties as to whether plaintiff is in compliance with the Act. A.C.A. 6–13–631 states in its basic provisions the clear preference of the Arkansas General Assembly for single-member zones as opposed to at-large voting, and the statute does not indicate that only those districts that are violating the Voting Rights Act must change to the zoned scheme.

If the exemption in (g)(4) attempts to give school districts a right to obtain advisory opinions from federal courts as to whether they are in compliance with the Voting Rights Act—and plaintiff's argument essen-

tially amounts to that contention—the Court would have to conclude that the exemption in (g)(4) is unconstitutional because it violates the Article III case or controversy requirement. However, in this case there is no reason to construe the statute in that light, and one of the principles of statutory construction posits that courts are not to construe statutes in such a way as to find that they are unconstitutional if there are other reasonable ways to interpret the statute. The state statute in its exemptions provisions (section g) demonstrated the intent to avoid any conflict between the operation of the state statute and federal court orders. Section (g)(1) exempts a district that is "currently operating under a federal court order enforcing school desegregation or the federal Voting Rights Act of 1965, as amended." As previously stated, Conway School District is not currently operating under such an order, and thus (g)(1) is not applicable. Section (g)(2) exempts school districts operating under "a preconsolidation agreement" that is in compliance with the Voting Rights Act, and plaintiff is also not operating under a preconsolidation agreement. A third exemption applies to districts that already have "a zoned board," and obviously does not apply to the Conway School District. Section (g)(4) exempts a district "that a federal court has ruled is not in violation of the federal Voting Rights Act of 1965, as amended, so long as the court order is in effect." This exemption cannot abolish the constitutional requirement that a federal court must have jurisdiction to issue any Order between proper parties before it has any power to entertain the lawsuit. If the Court ever faces the task of construing this statute in the context of an actual controversy, it will reach the issue of exactly how (g)(4) or other provisions of the statute should be applied.

Plaintiff seems to regard standing as a technicality that the Court should create a way to dispense with; but the Supreme Court has established the principle that standing provides the "personal stake in the outcome," the "concrete injury," and the "specificity" that are crucial to the judicial process:

> Concrete injury, whether actual or threatened ... adds the essential dimension of specificity to the dispute by requiring that the complaining party have suffered a particular injury caused by the action challenged as unlawful. This personal stake is what the Court has consistently held enables a complainant authoritatively to present to a court a complete perspective upon the adverse consequences flowing from the specific set of facts undergirding his grievance. Such authoritative presentations are an integral part of the judicial process, for a court must rely on the parties' treatment of the facts and claims before it to develop its rules of law. Only concrete injury presents the factual context within which a court, aided by parties who argue within the context, is capable of making decisions.

*Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 220 [94 S.Ct. 2925, 2931, 41 L.Ed.2d 706] (1974).

## FEDERALISM

Plaintiff has contended that it would not be able to seek relief under any of the exemptions in state court, and would "invite" a "pretextual lawsuit" in order to obtain an exemption if the Court does not find standing. This argument is also unavailing; on its face, a "pretextual lawsuit" would not be an actual controversy between adverse parties. Plaintiff is correct in its statement that a state court cannot issue the orders referred to in the exemptions, because the Arkansas General Assembly explicitly referred to "federal court orders" in the language of the state statute. However, if plaintiff sought an interpretation of the statute's meaning other than the exemption provisions, a state court would be as well or better qualified as this Court to hear such a case, since it is a state statute that is being interpreted; although the federal Voting Rights Act becomes involved in several of the statute's provisions, a state court is perfectly capable of interpreting that Act as well as the Arkansas statute.

Plaintiff repeatedly urges upon the Court its arguments concerning the "progressive" record of Conway School District in having elected a minority member to the board over a 20-year period. This argument is based upon the notion that if a district can adduce evidence that it has had a "progressive" rec-

ord even without an actual controversy, then a federal court must declare that the district need not comply with the state statute. Plaintiff goes on to argue that "if the Court does not allow this action to proceed, Conway would be in a position to *invite* a suit in federal court so that it might win a speedy summary judgment based upon the undisputed demographic evidence, voting patterns and minority representation." As Conway conceded in its supplemental brief that it fails the *Roberts v. Wamser* test for standing, it then asks the defendant to stipulate to the standing issue to avoid "the prospect of a pretextual lawsuit for alleged Voting Rights Act violations when none exist merely for a school district to qualify for an exemption." Standing has been the fundamental issue in this litigation, and defendant obviously has not and could not "stipulate to the standing issue;" plaintiff virtually asks the Court to ignore the law of standing, which it cannot do. The exemption in (g)(4) does not confer upon the 314 school districts covered by the statute a right to come into federal court and obtain advisory opinions—after a fact-intensive inquiry into voting patterns of each district—that the district either had a "progressive" record and therefore need not change to single-member zones as stated in the state statute's basic provisions, or that the district had a "weak" voting rights record and therefore would have to change to single-member zones. The state statute makes no such distinction, but states a generalized preference for single-member zones, and the Eighth Circuit has emphasized the importance of avoiding unnecessary federal judicial entanglement in state and local electoral matters: "We believe that our consideration of doubtful questions of standing to sue under the Voting Rights Act (or any other federal law that treads upon important interests of state and local governments) should be guided by a decent regard for the nature of our federal system." *Roberts*, at 622.

### SHAW V. RENO

■ In the last section of its supplemental brief, plaintiff makes an argument that presents a sharp contrast to the complaint and amended complaint. Originally, plaintiff was arguing that it qualified for an exemption to the statute, but made no criticism of the fundamental provisions of the statute. In its supplemental brief, however, plaintiff attacks the foundations upon which the statute was based, contending that "for the Arkansas statute to have any logical remedial impact, it would necessarily be based on the same type of presumptions which the Supreme Court in [*Shaw v. Reno,* —— U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)] warned against … Those presumptions by the legislature include that there will be single-member zones dominated by populations of a particular race." (Plaintiff's supplemental brief, at 6–7). Plaintiff cites the principle first stated in *Thornburg v. Gingles,* 478 U.S. 30, 49, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986) and cited in the Supreme Court's recent decision in *Shaw:* "Use of multi-member districts does not impede the ability of minority voters to elect representatives of their choice unless a bloc voting majority will usually be able to defeat candidates supported by a politically cohesive, geographically insular minority." Conway School District then concludes that "these broad presumptions made by the legislature seem to be the type of racial gerrymandering warned against in *Shaw.*"

The Court finds that plaintiff's position is incorrect, for the Arkansas statute does not involve the kind of "racial gerrymandering" prohibited by *Shaw.* In *Shaw,* North Carolina residents challenged a congressional redistricting plan on the grounds that the "redistricting legislation was so extremely irregular on its face that it could rationally be viewed only as an effort to segregate the races for purposes of voting, without regard to traditional districting principles and without sufficiently compelling justification." *Id.* at ——, 113 S.Ct. at 2816. The North Carolina plan at issue contained two majority-black districts, one of which resembled "a Rorschach ink-blot test," while the other was "approximately 160 miles long and, for much of its length, no wider than the I–85 corridor. It winds in snake-like fashion through tobacco country, financial centers, and manufacturing areas until it gobbles in enough enclaves of black neighborhoods." *Id.* at ——, 113 S.Ct. at 2820–2821. The North Carolina redistricting legislation in *Shaw* bears little

resemblance to the Arkansas statute; no lines have yet been drawn, and the local school officials are merely instructed to draw them in keeping with general principles consistent with the Voting Rights Act, based on the federal census and with substantially equal population. The legislature's preference for single-member zones is not a racial gerrymander, but is simply a general statement that the legislature prefers single-member districts to at-large electoral schemes as a matter of public policy.[2] Justice Brennan in *Thornburg* stated that while multimember districts and at-large election schemes are not per se violative of minority voters' rights ... This Court has long recognized that multimember districts and at-large voting schemes may " 'operate to minimize or cancel out the voting strength of racial minorities in the voting population.' " *Thornburg v. Gingles,* 478 U.S. 30, 47, 106 S.Ct. 2752, 2765, 92 L.Ed.2d 25 (1986). The Supreme Court noted that "Commentators are in widespread agreement with this conclusion" regarding at-large voting schemes, and cited an extensive list of scholarly studies on the often discriminatory effects of at-large schemes. *Thornburg,* at 47 n. 13, 106 S.Ct. at 2765 n. 13. Given the principles of federalism and standing as established by the Eighth Circuit, the Court finds no reason to intervene against the legislature's preference for single-member zones. The *Shaw* Court stated that,

> the legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination ... When members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes. The district lines may be drawn, for example, to provide for compact districts of contiguous territory, or to

maintain the integrity of political subdivisions. *Shaw,* at ——, 113 S.Ct. at 2826. There is nothing in the statute that instructs local school officials to ignore all principles of districting and to draw up a bizarre district that "can only be explained on the basis of race." If a school district did draw such lines, they would be unconstitutional as a violation of the Equal Protection Clause, as the Court in *Shaw* ruled. *Id.* at ——, 113 S.Ct. at 2828. The fact that the legislature was presumably aware that at-large zones have historically been used to restrict minority electoral access certainly does not constitute a "racial gerrymander."

Conway School District is only slightly over 10% minority in its voting population, so that it may be difficult to draw lines that would create a majority black district in a seven-member board. This Court has no way of knowing whether that would be possible; it would depend on where the minority voters live in the Conway School District and other factors. Most of them may live in one area so that they would form a majority in one zone—without creating an unconstitutional "Rorschach ink-blot" shaped district drawn solely based on race—but if they do not, Conway School District does not have to guarantee proportional representation. *Thornburg,* 478 U.S. at 42–44, 106 S.Ct. at 2762. Plaintiff is incorrect in its allegation that the legislature based the statute on the presumption that there will be single member zones "dominated by populations of a particular race." The legislature decided that the cutoff point for the statute's applicability would be a minority population of 10 percent. Clearly, any district with only 10 percent minority representation that has to create either five or seven single-member zones may have difficulty creating a zone in which the minority voters even form a majority, much less "dominate" the zone. By simple arithmetic, the legislature assumed that a district where the minority was only around 10 percent might draw up one zone with a slight majority of minority voters, or that one or more zones might have a substantial number of minority voters in the district but not

---

**2.** The legislature preferred single-member zones but was obviously not condemning all use of at-large schemes, because under the statute a board of directors still may choose to create five single-member zones and two at-large positions. A.C.A. 6–13–631(b).

quite over 50 percent. Contrary to plaintiff's assertion, there is nothing to indicate that the legislature was mandating that any zone must be "dominated" by voters of one race.

As the Supreme Court observed in *Thornburg*, Section 2(b) of the Voting Rights Act cautions that "nothing in Section 2 establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Thornburg*, 478 U.S. at 43, 106 S.Ct. at 2762. The legislature delegated to the local school districts considerable discretion in drawing up their zones— as the Arkansas statute requires, the selection procedures should be in compliance with the Voting Rights Act and should be substantially equal in population, but otherwise local districts will use their judgment in creating zones. The district's lawyers can advise them how to do that in compliance with the relevant state and federal laws; the Declaratory Judgment Act was never intended as a device to relegate to the courts the function of attorneys to give legal advice to their clients. *Hendrix v. Poonai*, 662 F.2d 719 (11th Cir.1981). Pursuant to *Roberts*, federal courts should not entangle themselves in state and local electoral matters in the absence of standing.

Conway quotes a passage in *Thornburg* that was made in a different context from the case at bar. Plaintiff cites the following requirement in *Thornburg:* when aggrieved minority voters are challenging a multimember form of districting as an alleged violation of Section 2, the minority population must be sufficiently large and geographically compact to constitute a majority in a single-member district, and the white majority must vote sufficiently as a bloc to enable it to usually defeat the minority's preferred candidate. *Thornburg*, 478 U.S. at 45–47, 106 S.Ct. at 2764. In *Thornburg*, minority voters were suing on a claim of vote dilution through submergence in existing multi-member districts, whereas in this case, plaintiff is criticizing a state statute that calls for substantial changes away from multimember districts (or alternatively, plaintiff is requesting an advisory opinion granting an exemption under the statute). There is nothing in *Thornburg* that would enable a school district to obtain a declaratory judgment in the absence of any controversy when the legislature has not even drawn any electoral lines.

Plaintiff simplifies the question of how minority success and access to the electoral system can be shown when it argues that it could win a "speedy summary judgment" based on the "undisputed" evidence submitted in the affidavit of the Conway Public Schools Superintendent and other information showing that a minority candidate served on the board from 1972 to 1988, and another minority candidate served from 1988 to the present. There is no doubt that the evidence is "undisputed" by defendant, but that is only because there is no controversy in this case and there is no dispute over plaintiff's compliance with the Voting Rights Act. Pursuant to the Supreme Court's analysis in *Warth v. Seldin*, supra, "it is within the trial court's power to allow or to require the plaintiff" to supply the Court with amendments or additional information allegedly supportive of plaintiff's standing; the Court in this case did request additional information. *Warth*, at 501, 95 S.Ct. at 2206. Even construing the complaint in favor of plaintiff, the amended complaint and additional information did not cure the lack of standing problem. The Supreme Court has observed that the Senate Report on the 1982 amendments to the Voting Rights Act stated that "the election of a few minority candidates does not 'necessarily foreclose the possibility of dilution of the black vote,'" noting that if it did, "the possibility exists that the majority citizens might evade Section 2 by manipulating the election of a 'safe' minority candidate." *Thornburg*, 478 U.S. at 75, 106 S.Ct. at 2779. Section 2(a) prohibits all states and political subdivisions from imposing any voting qualifications or prerequisites to voting, or any other procedures that would "result in the denial or abridgement of the right to vote of any citizen who is a member of a protected class of racial and language minorities." *Id.* at 43, 106 S.Ct. at 2762. Plaintiff makes these issues much more facile than they are by saying that the affidavit indicating that there has been one black school board member for 20 years would lead to a "speedy summary judgment" if this Court were to reach the merits. The *Thorn-*

*burg* Court ruled that "Under Section 2, it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate, that is important." *Id.* at 68, 106 S.Ct. at 2775. Saying that one minority candidate had been elected in an unbroken pattern for 20 years does not resolve the matter, because the Court has to consider—among other factors—whether the candidate was "the chosen representative of a particular racial group." The Senate Report established a "fact-intensive test" for violations of the Voting Rights Act: "Section 2 has been violated where the totality of circumstances reveals that 'the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Id.* The extent to which minority members have been elected to office is one factor that is significant, but it does not dispose of the issue. The "totality of circumstances" test requires detailed investigation into the voting patterns and history of the particular area in question.

The Court does not decide the issue of whether Conway School District would be in violation of the state statute by virtue of not being in compliance with the Voting Rights Act, because "standing is a threshold inquiry that eschews evaluation of the merits." *Roberts,* supra, at 620; *Coalition for the Environment v. Volpe,* 504 F.2d 156, 168 (8th Cir.1974). Even assuming, *arguendo,* that a district has a "progressive" voting record, that cannot dispense with the case or controversy requirement. Plaintiff asserts that if Conway does not have standing to file this type of lawsuit, then none of the districts with "progressive" racial records do. (Plaintiff's supplemental brief, at 4). If plaintiff is making the argument that the Court should find standing because if Conway does not have standing then no one else does, the Supreme Court has rejected such arguments: "The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing. This view would convert standing into a requirement that must be observed only when satisfied."

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 489, 102 S.Ct. 752, 767, 70 L.Ed.2d 700 (1982). The fact that if the present plaintiff cannot litigate this issue, none of the other "progressive" districts may do so supports the view that the issue is one to be resolved through the political process rather than the courts. *Schlesinger,* at 224; Charles Alan Wright, FEDERAL COURTS (1983), at 67; *Valley Forge,* supra. To the extent that there is any difference between the legislature's views and those of plaintiff, it ultimately comes down to a matter of political value preferences. Conway prefers at-large electoral schemes, while the legislature prefers single-member zones, with some limitations. If plaintiff wishes to change the statute, that result could be sought through appeal to the elected branches and the political process, but not through the judicial process. It is not appropriate for this Court to attempt to vindicate plaintiff's political value preferences, for this is a matter that should be—and through the passage of the act already has been—resolved through the political process; as the Supreme Court ruled in *Allen v. Wright,* the standing doctrine bars "adjudication of generalized grievances more appropriately addressed in the representative branches." *Allen,* at 751.

Plaintiff would be able to assert standing as an aggrieved voter if the Arkansas statute were a racial gerrymander; as the *Shaw* Court described the injuries inflicted by such a system as the one proposed in North Carolina: "A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls. We have rejected such perceptions elsewhere as impermissible racial stereotypes." *Shaw,* at ——, 113 S.Ct. at 2826.

The statute here does not involve the kind of "apartheid" that inflicted the injury of racial stereotyping in *Shaw.* *Shaw* applies to the narrow category of cases involving bizarrely-shaped districts drawn solely on the basis of race in disregard of all other districting principles.

■ In addition to the lack of standing, this case also fails to meet the ripeness doctrine of the case or controversy requirement. The Arkansas Department of Education has not found Conway to be in violation of the state statute, and has not threatened to find it in violation. Neither the U.S. Attorney General nor any aggrieved voter has yet accused plaintiff of violating the Voting Rights Act. As Justice Frankfurter once wrote concerning the ripeness doctrine. "The adjudicatory process is most securely founded when it is exercised under the impact of a lively conflict between antagonistic demands, actively pressed, which make resolution of the controverted issue a practical necessity." *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). The Supreme Court ruled that among the issues to be considered under the ripeness doctrine are "the appropriateness of the issues for decision by this Court and the actual hardship to the litigants of denying them the relief sought." *Id.* There is no discernible harm that would befall plaintiff if it changed to single-member zones, and it would be inappropriate for this Court to decide these issues.

### PRECLEARANCE

■ Plaintiff refers to the pre-clearance section of the Voting Rights Act. Under Section 5 of the Voting Rights Act, "any action under this section shall be heard and determined by a court of three judges," and any appeal shall lie to the Supreme Court. That Section states that whenever a state or political subdivision that is covered by the Voting Rights Act "shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect" previously, the state or subdivision "may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." Such a voting procedure can be enforced without such a declaratory judgment if it has been submitted by the state or political subdivision to the U.S. Attorney General, and the U.S. Attorney General has not interposed an objection within 60 days after such submission. 42 U.S.C. 1973.

Plaintiff argues that "The Conway Public School District merely seeks to retain that practice which has been utilized in the past. However, a three-judge panel may be appropriate in this instance as there is no indication that the State of Arkansas has either sought or obtained pre-clearance from the Attorney General with respect to Act 1169." Plaintiff's argument is erroneous, for the pre-clearance requirements do not apply to the State of Arkansas. The preclearance requirements apply to any state or political subdivision of a state which "(1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November, 1964." (The dates were updated to include later presidential elections.) Arkansas repealed its poll tax in 1964 and it did not have a literacy test for voting in 1965. *Jeffers v. Clinton,* 740 F.Supp. 585, 586 (E.D.Ark., 1990). In the 1964 elections, 560,426 voters cast ballots, representing 54 percent of the voting age population; and 69 percent of the voting age population registered in 1964, so that Arkansas was not covered then. (Official election returns for the 1964 presidential election, Office of the Secretary of State of Arkansas). It has not been covered by the preclearance requirement of Section 5 since then, as well. States that are covered by Section 5 are Alabama, Alaska, Arizona, Georgia, Louisiana, Mississippi, South Carolina, Texas, and Virginia. Certain counties

in California, Florida, Michigan, New Hampshire, New York, North Carolina and South Dakota are covered.[3]

■ In addition to the automatic preclearance requirements in the Voting Rights Act, Section 3(c) empowers a court to impose the preclearance remedy on states or political subdivisions not originally covered. *Jeffers,* supra, at 586. Section 3(c) applies to those "pockets" of discrimination that exist outside the jurisdictions that Section 5 automatically covered, *Id.* at 604. The only preclearance remedy applicable to Arkansas under Section 3(c) was handed down in *Jeffers* regarding majority vote requirements in municipal and county run-off elections. *Id.* Judge Arnold concluded in *Jeffers* that "The State has systematically and deliberately enacted new majority-vote requirements for municipal offices, in an effort to frustrate black political success in elections traditionally requiring only a plurality to win. We therefore direct that any future laws, standards, or practices designed to enforce or enhance a majority-vote requirement not take effect until the preclearance process has run its course." *Id.* The Court concluded that the equitable relief in Section 3(c) was appropriate in that case, where the majority vote run-off statutes in municipal and county offices "represented a systematic and deliberate attempt to reduce black political opportunity and therefore violated the Fourteenth and Fifteenth Amendments." The preclearance remedy is rarely used, only being utilized in such a "systematic and deliberate" case as *Jeffers.* A.C.A. 6–13–631 clearly does not represent any unconstitutional effort to reduce black political opportunity and does not involve majority vote requirements for run-offs, hence the *Jeffers* preclearance requirement is not applicable here.

It should be emphasized that *Jeffers* was restricted to the holding that "any further statutes, ordinances, regulations, practices, or standards imposing or relating to a majority-vote requirement in general elections in this State must be subjected to the preclear-

ance process ... In all other respects, plaintiffs' request for statutory preclearance under Section 3(c) will be denied." *Id.* at 601. The Court decided that it would not impose preclearance on a broader basis, concluding that the state was making progress in the realm of "political change" and that a trend toward single-member systems was one of the positive developments:

> In making this choice [to restrict its holding regarding preclearance] we take into account ... that the pace of political change in this State is quickening. We credit, in this regard, the testimony of Governor Clinton at the trial. We also note an increasing trend, taking place in many areas of the State, of conversion of at-large election systems to single-member systems. This trend is evident in litigation affecting school board elections and municipal elections. It was already positive law with respect to elections for quorum courts, the legislative bodies of counties. *Id.*

The legislature had no obligation to submit for preclearance the change toward single-member systems in school board elections embodied in A.C.A. 6–13–631.

## CONCLUSION

The Court finds that plaintiff lacks standing to bring this lawsuit pursuant to *Allen v. Board of Elections, Roberts v. Wamser* and the other case law cited above. Plaintiff also fails to find standing regarding its arguments based upon *Shaw v. Reno.* The preclearance requirements are not applicable in this case. The motion to dismiss is granted.

It is so ordered.

---

**3.** New Mexico is also covered by the preclearance requirement of Section 3(c) as a result of litigation challenging its post–1980 redistricting plan. *Sanchez v. Anaya,* No. 82–0067M (D.N.M., 1984); John Dunne, Assistant Attorney General, Civil Rights Division, Bush Administration, Address, Feb. 8, 1991, Mayflower Hotel, Washington, D.C.