John HARRIS, et al., Plaintiffs,

v.

The CITY OF HOUSTON, Defendant.

No. Civ.A. H–96–3621.

United States District Court,
S.D. Texas,
Houston Division.

Nov. 20, 1997.

Ronald D. Secrest, Beck Redden and Secrest, Houston, TX, for John D. Harris, Thomas Phillips, Mary Almendarez, Harris County Utility Dist. No. 1, 2, 3, 4, 5, 8, 10, 93, 145, 236, 262, 350, and 356.

Christopher B. Allen, Houston, TX, for Compass Bank–Houston.

Linda D. King, Winstead Sechrest & Minick, Houston, TX, for Nations Bank of TX.

Ileana M. Blanco, Bracewell & Patterson, Houston, TX, for Riverway Bank.

William C. Ferebee, O'Donnell Ferebee et al, Houston, TX, for Pinemont Bank N.A.

Jennifer L. Davis, McGlinchey Stafford, Houston, TX, for Texas Commerce Bank, Chase Secutities of Texas Inc.

Jonathan Day, Mayor Day Caldwell and Keeton, Houston, TX, for The City of Houston.

Kathy D. Patrick, Gibbs and Bruns, Houston, TX, for Merrill Lynch Pierce Fenner & Smith Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ATLAS, District Judge.

Plaintiffs filed this Voting Rights Act complaint challenging the decision of the City of Houston ("City") to annex the Kingwood residential area ("Kingwood"). By prior order, all state law claims were dismissed [Doc. # 76]. A claim filed pursuant to section 5 of the Voting Rights Act, 42 U.S.C. § 1973c ("Section 5"), was considered and rejected by a three-judge court [Doc. # 44]. The remaining claims are based on section 2 of the Voting Rights Act, 42 U.S.C. § 1973 ("Section 2"), and on the Fourteenth and Fifteenth Amendments to the United States Constitution.

The parties have agreed to submit the case to the Court for final decision based on the evidence presented to the late Judge Norman Black in connection with Plaintiffs' request for a preliminary injunction. This Court has certified familiarity with the record pursuant to Rule 63 of the Federal Rules of Civil Procedure [Doc. # 171]. The parties agree with the Court that the proceedings may be completed by the undersigned without prejudice to any party.

The Court observed a number of the witnesses as they testified at the preliminary injunction hearing, and has reviewed all the evidence in the record, including without limitation the joint pretrial order, the parties' proposed findings of fact and conclusions of law, and the stipulations offered by the parties. The Court has also reviewed the applicable case law, and has applied the governing legal standards to the evidence presented. Based on this review, the Court makes the following findings of fact and conclusions of law, and holds that Plaintiffs have failed to establish any of their claims and Defendant is entitled to judgment in this case.

### FINDINGS OF FACT

1. Plaintiff John Harris is an Anglo male who resides in Kingwood. He is a director and president of the Harris County Utility District No. 5, and is the spokesperson for the Kingwood Annexation Strategy Committee.

2. Plaintiff Thomas Phillips is an African–American male who resides in the Bordersville community of the City of Houston.

3. Plaintiff Mary Almendarez is a Hispanic female who resides in the City of Houston.

4. Plaintiff Utility Districts are political subdivisions of the State of Texas.[1] They provide water and sewer services for the communities they serve. On December 11, 1996, the City Council enacted an ordinance abolishing the Plaintiff Utility Districts.

5. On December 11, 1996, the Houston City Council ("City Council") enacted an ordinance annexing Kingwood. Ordinances were enacted annexing other areas on that day, as well as on December 4 and 18, 1996.

6. The December 11 ordinances became effective at 12:01 a.m. on December 12, 1996. The other ordinances became effective thereafter.

7. On December 23, 1996, the various annexations and the abolition of the Utility Districts were submitted to the Attorney General of the United States for preclearance under Section 5. On February 24, 1997, the Attorney General indicated that there was no Department of Justice ("DOJ") objection to the annexations or to the abolition of the Utility Districts. DOJ noted, however, that because the annexation resulted in a numerical disparity in the relative populations of City Council districts, redistricting would be necessary.

8. Because DOJ preclearance had not been obtained by January 18, 1997, Plaintiff Harris and other Kingwood residents were not eligible to participate in the City's election held that day. The January 18 special election included votes on the following: (1) Council Member, At–Large, Position 4; (2)

---

**1.** Plaintiff Utility Districts are Harris County Utility Districts No. 1, No. 2, No. 3, No. 4, No. 5, No. 8, No. 10, and Harris County Municipal Utility Districts No. 93, No. 262, No. 350, and No. 356.

an initiative requesting a City ordinance raising the minimum wage in the City; and (3) an initiative requesting a City Charter amendment limiting governmental taxing authority.

9. On April 9, 1997, the City Council adopted a redistricting plan dividing the City, including the newly-annexed areas, into nine council districts of relatively equal populations, that is, the districts had less than a 10% variance based on 1990 census data. The redistricting plan includes two districts in which a majority of the voting age population is African–American and two districts in which a majority of the voting age population is Hispanic.

10. On May 6, 1997, the redistricting plan was submitted to the Attorney General of the United States for DOJ approval. On July 7, 1997, the redistricting plan received DOJ preclearance.[2]

11. The Kingwood/Forest Cove area was the largest area annexed by the City in the 1996 annexations. The voting age population of the area is approximately 40,000 people, of which 92% are Anglo.

12. Three other populated areas were part of the 1996 annexations. These areas range in size from approximately 1,450–2,000 persons. In each of these three areas, the population is predominantly African–American; voting age population in the three areas is approximately 36%, 91% and 96% African–American.

13. Prior to the 1996 annexations, the voting age population of the City (based on 1990 census data) was 46.24% Anglo, 25.58% African–American, 23.88% Hispanic, and 3.91% Asian. After the 1996 annexations, the voting age population of the City (based on 1990 census data) is 47.16% Anglo, 25.18% African–American, 23.41% Hispanic, and 3.86% Asian.

14. Plaintiffs rely predominantly on comments they claim were made by the City's Mayor during a meeting with Plaintiffs' representatives. The City Mayor commented that there was not enough money in the annexation to justify the "headaches" involved. This comment was credibly explained by Jerry Wood, the executive assistant to the director of Planning and Development for the City. Wood testified that the comment was jokingly made to express the idea that no amount of money would outweigh the headaches necessarily involved in the annexation process.

15. Plaintiffs also presented testimony that the Mayor stated at the meeting that the annexation was necessary because Anglos keep moving out of the City, and the people who remain are not interested in government, do not participate, and are difficult to govern. Mayor Lanier emphatically denied making the statement, and his testimony was supported by Wood's. The Court finds that Wood and Mayor Lanier are credible. The Court finds, after consideration of the testimony of all the witnesses, that Mayor Lanier did not make the comments alleged by Plaintiffs or any other comments which expressed a racially discriminatory motive in pursuing the Kingwood annexation.

16. Plaintiffs also argue that the Kingwood annexation would not provide an economic benefit to the City and, therefore, the City's purported economic justification was mere pretext for its racially discriminatory motivation. Plaintiffs' economics expert, William Avera, testified that his analysis indicates that the Kingwood annexation is not economically justified. Avera recognized, however, that Kingwood is a rapidly growing area which has increased in population by approximately 12,000 persons since 1990. Avera also acknowledged that he had not previously studied the effects of annexation on a municipality.

17. The credible evidence establishes that the Kingwood annexation was pursued for legitimate financial and policy reasons and not for an improper racially discriminatory purpose. The City, primarily through Richard Lewis, Director of Finance & Administration, began an extensive financial analysis in the summer of 1995 to evaluate the areas proposed for annexation. As the analysis progressed throughout the year, assumptions were changed, as did the resulting evaluations. For example, in July 1996, a non-

---

2. This redistricting plan and its alleged noncompliance with the Voting Rights Act and the United States Constitution are not issues in this suit and need not be addressed herein.

refunded debt analysis indicated a negative projected economic impact. The final revision, using a growth rate more consistent with Kingwood's past growth rate and using a refunded debt analysis, indicated a positive economic benefit to the City as a result of the annexation.

18. The City determined to its satisfaction that the Kingwood annexation would produce a positive long-term economic impact for the City. Plaintiffs' evidence that the economic benefit to the City could be marginal and that the analyses were subject to revisions prior to the annexation decision does not contradict the City's evidence. The City established that there would be some economic benefit, at least over the long term. The City officials maintained a good faith belief that its analysis was correct.

19. The history of minority success in at-large elections in the City is well-established. It is both sustained and consistent.[3] In the past ten years, there have been 17 elections in which a minority candidate was elected to an at-large position on the City Council. At the time of the preliminary injunction hearing, four of the five at-large council seats were held by minorities.

20. The evidence presented by Plaintiffs' expert, Dr. Henry Flores, through his report (Plaintiffs' Exh. 43) and his testimony at the preliminary injunction hearing lacked probative value. His opinions, even as amended by further analysis mentioned in his supplemental affidavit submitted after the hearing, are based on flawed assumptions and questionable methodology. As a result, Dr. Flores's opinion that the annexation of Kingwood would dilute minority voting strength in the City is not credible. Dr. Flores used Kingwood's 1996 level of registered voters to analyze elections which occurred almost a decade earlier. He assumed that Kingwood voters would participate in City elections at the same turnout rate as they participate in general elections, including those involving

election of the President of the United States.

21. Dr. Flores repeatedly stated during his testimony that he would have considered other important factors, such as the changes in voting age population between 1991 and 1996, if he had more time. The evidence demonstrated that these considerations were substantial.

22. Dr. Flores's explanation of the mathematical means of measuring polarization was inconsistent with the published explanation of the recognized expert, Dr. Bernard Grofman, on whom Dr. Flores specifically relied. In fact, Dr. Flores's use of "$r$" as a measure of polarization appears to contradict the practices recommended by Dr. Grofman.

23. Dr. Flores admitted that he had a "crash" in his database for 1994, so information from that year was excluded from his analysis. Dr. Flores also admitted that he did not have and did not consider data for the 1996 general election returns. As a result, Dr. Flores did not consider elections in those two years in which the minority candidate ran as a Republican and was supported by non-minority voters.

24. Dr. Flores also discovered during cross-examination that his regression analysis was based on inaccurate data. Specifically, the numbers in the data used for his analysis were actually the last two digits of the actual vote. Dr. Flores conceded that this would affect the reliability of his regression analysis. The Court has considered Dr. Flores's supplemental testimony, submitted through an affidavit dated November 20, 1996, but does not find the amended testimony persuasive evidence on the issues before the Court in light of the record as a whole.

25. Dr. Flores's conclusions are derived by including only carefully selected elections and excluding almost all elections of minority candidates to at-large positions. Dr. Flores

3. The Court notes that Houston mayoral candidate Lee Brown, an African–American, received over 40% of the votes in the November 1997 open election in a field of six candidates with no incumbent. The closest candidate behind Brown, an Anglo businessman, garnered less than 30% of the votes. Additionally, in the November 1997 election for City Controller, Sylvia Garcia, a Hispanic female, defeated Lloyd Kelley, an incumbent Anglo. Although this is not evidence considered by the Court in making its findings of fact and conclusions of law, it is additional indicia of the consistency with which minority voters successfully elect candidates of their choice in at-large elections in the City.

justified these exclusions, including the exclusion of all elections in which a candidate ran as an incumbent, as "special circumstances" under Supreme Court case law. Notwithstanding the unrealistically extreme assumptions and the overwhelming evidence of bias in his model, Dr. Flores was only able to identify two elections (discussed below) where he believes the Kingwood annexation would have potentially made a difference in the actual result.

26. In 1991, Judson Robinson III, an African–American, defeated John Kelley, an Anglo, by approximately 2,000 votes in a run-off election. For the Kingwood annexation to have changed the outcome of this election, the Kingwood area would have needed voter turnout of 155% the actual City turnout, a highly unrealistic assumption. The credible evidence does not indicate the Kingwood annexation would have changed the result of this election.

27. In 1995, Orlando Sanchez defeated David Ballard by approximately 100 votes. It is most likely, however, that the Kingwood voters would have supported Sanchez because he was the more conservative candidate and had previously campaigned as a Republican. The Kingwood annexation would only have *increased* Sanchez's margin of victory.

28. The evidence presented by Defendant's expert, Dr. John R. Alford, through his report (Defendant's Exh. 27) and his testimony at the preliminary injunction hearing is based on proper analysis and is credible. Dr. Alford assumed a voter turnout rate in Kingwood for City elections equal to that in the Clear Lake area, a part of the City demographically similar to Kingwood. Dr. Alford considered elections improperly excluded by Dr. Flores, and used appropriate voting age population figures for the various elections.

29. Dr. Alford recognized that the voters in Kingwood generally vote for the more conservative, Republican candidate without regard to the candidate's race or ethnicity. As a specific example, Dr. Alford mentioned now Federal District Judge Kenneth Hoyt, an African–American Republican who received approximately 80% of the vote in the Kingwood precincts in 1984 when he was a successful candidate for a state appellate court. As correctly noted by Dr. Alford, Democrats are "the minority that the Kingwood voters won't support."

30. Although the City has a history of discrimination against minorities, that history is not a recent one. Indeed, Plaintiffs' most recent evidence of discrimination is from the early 1970's.

31. The voters in the City are not polarized by racial considerations. As discussed previously, Dr. Flores's opinions to the contrary are based on flawed analyses.

32. Members of minority groups have been elected repeatedly to public office in the City.

33. The needs of the citizens of Bordersville are not particular to that area and the City has not displayed a substantial lack of responsiveness to the non-particularized needs of Bordersville residents.

34. Plaintiffs have not presented evidence of (1) voting practices or procedures in the City which enhance the opportunity for discrimination; (2) a candidate slating process in the City to which minorities are denied access; (3) effects of past discrimination which hinder the ability of minorities to participate effectively in the City's political process; or (4) political campaigns in the City which have been characterized by racial appeals.

35. The annexation of Kingwood will not have a discriminatory impact on the minority voters in the City. It will not cause minority voters to have less opportunity to participate in the political process and to elect candidates of their choice in both at-large and single-member district elections. It will not create a situation in which the Anglo majority votes as a bloc usually to defeat the minority candidate.

36. The Kingwood annexation was not the result of a racially discriminatory purpose and does not have a racially discriminatory or diluting impact.

37. Plaintiffs point to evidence concerning Bordersville, a racially identifiable minority community within the City. It appears that Bordersville lacks certain services such as

sewers, fully paved streets, and sidewalks. Dunham Estates and Northshore are annexed areas which are primarily minority. These communities, like Bordersville, may lack certain services. However, the City has explained that slower development in Bordersville was due to the lack of adequate plats and the absence of rights-of-way and easements. Plaintiffs have not contradicted this evidence in any meaningful way.

38. The City has not denied water, wastewater treatment, street maintenance, lighting, or any other municipal services to any area of the City, including Bordersville, on the basis of race, color, national origin, or any other improper classification. Any disparity in services provided to Bordersville and other areas of the City is the result of economic circumstances, not any discriminatory classification.

39. Any of the foregoing findings of fact which would be more appropriately characterized as a conclusion of law is adopted as such.

### CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

2. The Court has personal Jurisdiction over all parties.

3. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

4. Federal law governs the remaining issues in dispute.

■ 5. An annexation constitutes a change with respect to voting and is within the purview of the Voting Rights Act. *Rome v. United States*, 446 U.S. 156, 161, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). A annexation-related voting change cannot be submitted for DOJ preclearance until it has become final. 28 C.F.R. § 51.21 (1996). *See also Alexander v. City of Pearland*, 945 F.Supp. 1069, 1070 (S.D.Tex.1996).

■ 6. Plaintiff John Harris, an Anglo, cannot represent the interests of the minority residents of the City. *Newman v. Voinovich*, 789 F.Supp. 1410, 1416 (S.D.Ohio 1992), *aff'd*, 986 F.2d 159 (6th Cir.), *cert. denied*, 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993).

■ 7. Plaintiff Utility Districts are not aggrieved persons within the meaning of the Voting Rights Act and have no standing to pursue this litigation. *See Conway School Dist. v. Wilhoit*, 854 F.Supp. 1430, 1433–34 (E.D.Ark.1994).

■ 8. The only Plaintiff's with potentially cognizable claims under the Voting Rights Act are Phillips and Almendarez, who are members of minority groups and who resided in the City prior to annexation. *Conway School Dist.*, 854 F.Supp. at 1433–34; *Newman*, 789 F.Supp. at 1416.

■ 9. The Voting Rights Act "does not purport to guarantee or to compel minority representation in publicly elected bodies that is proportional to the racial makeup of the political unit." *Seastrunk v. Burns*, 772 F.2d 143, 153 (5th Cir.1985); 42 U.S.C. § 1973(b). "Nor has any equal protection analysis ever imposed such a guarantee of electoral success." *Seastrunk*, 772 F.2d at 153.

■ 10. Plaintiffs bear the burden of proof on their Section 2 claim. *Thornburg v. Gingles*, 478 U.S. 30, 46, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The Section 2 claim does not require that Plaintiffs prove discriminatory intent. 42 U.S.C. § 1973; *Gingles*, 478 U.S. at 44, 106 S.Ct. 2752.

■ 11. To prevail on a Section 2 claim, a minority Plaintiff must first show that (1) the minority is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances—usually to defeat the minority group's preferred candidate. *Gingles*, 478 U.S. at 51, 106 S.Ct. 2752; *League of United Latin American Citizens (LULAC) v. Clements*, 999 F.2d 831, 849 (5th Cir.1993), *cert. denied*, 510 U.S. 1071, 114 S.Ct. 878 (1994). Failure to satisfy any portion of the three-part test is fatal to a Section 2 claim. *Overton v. City of Austin*, 871 F.2d 529, 538 (5th Cir.1989).

■ 12. The parties agree that, as a matter of law, the first prong is satisfied in this

case. Plaintiffs have failed, however, to establish the third prong of the *Gingles* test.

13. The special circumstances aspect of the third factor, majority bloc voting, is designed to address occasional instances of minority electoral success and does not apply where there has been a sustained history of minority electoral success. *Rollins v. Fort Bend Independent School Dist.*, 89 F.3d 1205, 1213–14 (5th Cir.1996). The Supreme Court's comment in *Thornburg v. Gingles* that special circumstances may explain a single minority candidate's victory "cannot be transformed into a legal standard which requires the court to force each and every victory of several minority candidates to fit within a prescribed special circumstance. Every victory cannot be explained away as a fortuitous event." *Id.* at 1213. *See also Lewis v. Alamance County*, 99 F.3d 600, 617 (4th Cir.1996) (incumbency "special" circumstance is not intended as a "categorical rule that all electoral successes of a minority-preferred incumbent are to be discounted.").

■ 14. When the evidence establishes that "partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens," a Section 2 claim fails. *LULAC*, 999 F.2d at 850. *See also Whitcomb v. Chavis*, 403 U.S. 124, 153, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) (distinguishing between actionable vote dilution and political defeat).

15. Were the Court to determine that Plaintiffs had satisfied this tripartite threshold showing, the Court would need to evaluate whether, under the "totality of the circumstances, the plaintiffs have demonstrated a violation of section 2." *See, e.g., Westwego Citizens for Better Government v. City of Westwego*, 946 F.2d 1109, 1116 (5th Cir.1991). *See also LULAC*, 999 F.2d at 849.

16. Plaintiffs under Section 2 must establish that, based on the totality of the circumstances, the political processes leading to nomination or election are not equally open to minority citizens, and that minority citizens have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 42 U.S.C. § 1973(b). *See also LULAC*, 999 F.2d at 849. Plaintiffs have failed to meet this burden. There is no

evidence that the processes leading to nomination or election are not equally open to minority citizens, or that minority citizens have less opportunities to participate in the political process. The evidence indicates clearly that the City's minority citizens have an established record of successfully electing representatives of their choice.

17. Furthermore, the 1982 Senate Report listed several factors to be considered by the Court in determining the totality of the circumstances question. S.Rep. 417 at 28–29, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 206–07. These factors were derived from the Fifth Circuit's decision in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (*en banc*), *aff'd sub nom East Carroll Parish School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). *LULAC*, 999 F.2d at 850 n. 22.

■ 18. The *Zimmer* factors include (1) the extent of any history of official discrimination; (2) racially polarized voting; (3) voting practices or procedures which enhance the opportunity for discrimination; (4) a candidate slating process from which minorities are excluded; (5) effects of past discrimination which hinder the ability of minorities to participate effectively in the political process; (6) political campaigns based on racial appeals; (7) the extent to which minorities have been elected to public office; (8) a significant lack of responsiveness to the particularized needs of minorities; and (9) a tenuous policy underlying voting qualifications, practices or procedures which discriminate. *See LULAC*, 999 F.2d at 849–50, n. 22.

19. Consideration of the *Zimmer* factors establishes, for the reasons set forth above, that Plaintiffs have failed to prove that, under the totality of the circumstances, minorities do not possess the same opportunities to participate in the City political process and to elect representatives of their choice as enjoyed by Anglo voters. Plaintiffs have also failed to prove that the Kingwood annexation would, under the totality of the circumstances, create such a situation.

■ 20. The provisions of Section 5 which prevent newly annexed residents from participating in the political process during

the period when preclearance is being sought is not a violation of the United States Constitution. *Rome,* 446 U.S. at 182–83, 100 S.Ct. 1548; *State of South Carolina v. Katzenbach,* 383 U.S. 301, 335, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

 21. A voting change that has not been precleared under Section 5 is of no force or effect. *United States v. County Comm'n,* 425 F.Supp. 433, 436 (S.D.Ala. 1976), *aff'd,* 430 U.S. 924, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977). Plaintiff Harris was not entitled to vote in the January 1997 City special election prior to the Kingwood annexation. After annexation, Harris's right to vote in that and other City elections was contingent on DOJ preclearance of the annexation. Consequently, Harris has not been deprived of an existing right to vote. *See Dotson v. City of Indianola,* 514 F.Supp. 397, 403 (N.D.Miss.1981), *aff'd,* 456 U.S. 1002, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982).

22. In order to prevail on their constitutional vote dilution claim, Plaintiff's must establish both a dilutive effect and a discriminatory intent or purpose. *City of Mobile v. Bolden,* 446 U.S. 55, 67–68, 100 S.Ct. 1490 (1980).

23. To prevail on their race discrimination claims under the Fourteenth and Fifteenth Amendments, Plaintiffs must establish both a racially discriminatory purpose and a racially discriminatory impact. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *McCarty v. Henson,* 749 F.2d 1134, 1136 (5th Cir. 1984). Plaintiffs have established neither.

24. In the absence of a classification based on race, color, national origin, or other improper consideration, there is no constitutional requirement that all parts of a city receive identical services. *See Westbrook v. City of Jackson,* 772 F.Supp. 932, 941–42 (S.D.Miss.1991).

25. The Kingwood annexation does not violate Section 2 of the Voting Rights Act.

26. The three-judge court has determined that the Kingwood annexation has not violated Section 5 of the Voting Rights Act.

27. The Kingwood annexation violates neither the Fourteenth nor the Fifteenth Amendment to the United States Constitution.

28. Any of the foregoing conclusions of law which would more appropriately be characterized as a finding of fact is adopted as such.

29. Final judgment will be issued by separate order.